THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals

 
 
 
 The State, Respondent,
 v.
 Wanda J. Haithcock, Appellant.
 
 
 

Appeal From Horry County
 John  L.  Breeden, Circuit Court Judge

Unpublished Opinion No. 2007-UP-099
Submitted February 1, 2007  Filed February 23, 2007

AFFIRMED

 
 
 
 Appellate Defender Robert M. Dudek, South Carolina Commission on Indigent Defense, of Columbia, for Appellant.
 Attorney General Henry Dargan McMaster; Chief Deputy Attorney General John W. McIntosh; Assistant Deputy Attorney General Donald J. Zelenka; Assistant Attorney General Melody J. Brown, all of Columbia; and Solicitor John Gregory Hembree, of Conway, for Respondent.
 
 
 

PER CURIAM:  Appellant, Wanda Haithcock, was convicted of the murder of Kenneth Wayne Coates, Sr.  The trial court sentenced Haithcock to thirty years imprisonment.  Haithcock appeals, asserting the trial court erred in denying her motion for a directed verdict.  We affirm.[1]
FACTUAL/PROCEDURAL BACKGROUND
On the afternoon of January 24, 2001, two women discovered the body of Kenneth Wayne Coates, Sr. in an abandoned house on Dongola Highway in Horry County.  Two spent bullet casings from a .25 semi automatic round were found at the scene:  one at the foot of Mr. Coates and the other just above the head.  An autopsy revealed Mr. Coates had been shot in the back of the neck and in the left forehead.  The shot to the forehead was qualified as the cause of death.  An expert in crime scene investigation testified it was his opinion Mr. Coates was shot in the back of the neck while in an upright position, collapsed to the ground, and received the second shot while he was lying on the floor in the abandoned home.  The forensic pathologist who performed an autopsy on Mr. Coates on January 25, 2001 testified she estimated at the time of the autopsy that Mr. Coates had been dead greater than four days.  However, given the cooler temperatures that occurred that January, she stated Mr. Coates could have been dead for three weeks, and could have possibly died on January 6, 2001.  It is undisputed that Mr. Coates was murdered.  
Mike Owens testified Mr. Coates had worked for his company since 1966.  The last day he worked was Friday, January 5, 2001.  Mr. Coates left work that evening around 5:00.  Owens testified Mr. Coates usual habit was to work on Saturday mornings.  However, he did not show up for work that next morning.  They did not look for him, though, and only became concerned when Mr. Coates failed to show up for work on Monday.  Although Owens stated there was a time several years back where Mr. Coates, without explanation, failed to show for work for approximately three or four days, he testified this was not typical behavior of Mr. Coates, who usually called in if he was going to be off somewhere.  Mr. Coates never came back to work after that Friday, and Owens had not seen him since then. 
Phil Whittaker also testified regarding the last contact he had with Mr. Coates.  Whittaker stated he was a close friend to Mr. Coates and usually saw him four, five or six times a week, often playing golf on the weekends and shooting pool.  On the evening of Friday, January 5, Whittaker and Mr. Coates met for a cocktail.  They went to another establishment to play pool and sing Karaoke, went back to the first meeting place, then on to a restaurant.  They left the restaurant around 2:30 a.m. that Saturday.  Mr. Coates headed toward his home in his white Ford Explorer.  Whittaker called Mr. Coates in the morning, attempting to contact him through his cell phone, his home phone and his pager without success.  Whittaker testified Mr. Coates usually went to work on Saturday mornings, and if he was busy at work, he may not return his call right away, but would call about an hour later.  On this occasion, Mr. Coates never called him back.  Whittaker never saw Mr. Coates after that night. 
The State presented evidence from several witnesses who saw a female and a white Ford Explorer on January 6, 2001 near the abandoned home where Mr. Coates body was found.  Wade Lawrimore testified that on that day, he had been working at his shop and needed to pick up a gas can from his home.  After picking up the can, he drove by the abandoned home that belonged to his mother and observed a white Ford Explorer parked by a pile of dirt that he had placed in the area to keep people from driving behind the house.  He stopped to check on the situation and talked with a woman sitting in the drivers seat of the Explorer.  Also present was a person in the passengers seat, looking straight ahead.  Wade asked what they were doing there, and the woman told him they had run out of gas.  Wade offered to go get some gas for them, but the woman declined, stating that her boyfriend had already caught a ride and was headed toward Waccamaw Grocery to retrieve some gas.  Wade stated he could see the woman because she leaned out of the window, but he never got a clear sight of the person sitting in the passenger seat.  He saw a silhouette of the passenger, who he assumed was a man.  The passenger never spoke.  From the silhouette he could tell the head of this person rested on a headrest, and constantly looked forward.  Wade got an uneasy feeling from the situation with the unmoving passenger, and thought the two people may have been in an argument.  Because it was the middle of the day, Wade then drove off to the store to get some lunch.  As he drove down the road, he did not see anyone walking with a gas can.  Thereafter, Wade was shown a photographic array and picked Wanda Haithcocks picture out as the woman he had observed at the abandoned home at the time in question.  
Wades nephew, Steven Lawrimore, and Stevens wife, Ginger Lawrimore, also testified to seeing a woman and a white Ford Explorer in the area of the abandoned home on January 6, 2001.  Steven testified that it was after dark on that date when he and his wife were driving on Dongola Highway and noticed a white Explorer at his grandmothers old house.  When they stopped to see why it was there, they saw a woman standing on the porch of the home of his deceased uncle, approximately 150 to 200 yards away.  Steven asked the woman if she needed help, and she stated she was trying to use a phone.  The woman said she had run out of gas, and someone had picked up her boyfriend to go retrieve some.  Steven told the woman that no one lived at the residence and that he could take her to a telephone.  The woman, who seemed to be nervous, then got in the vehicle with Steven and Ginger.  They drove approximately 100 yards to the home of Stevens parents.  Steven took the woman inside and handed her a cordless phone.  Steven heard beeps, as if the woman dialed a number, then muffled conversation.  After she made the phone call, Steven and Ginger drove her back to the Explorer that was parked at Stevens grandmothers house.  Steven asked the woman if she wanted them to wait with her since there had been problems with people vandalizing the house in the past.  The woman declined, stating her boyfriend would be back shortly.  The woman then got in the drivers seat of the Explorer.  Steven was shown a photographic array approximately two to three weeks later, but was unable to definitely pick out the woman he gave a ride to that night.  
Ginger Lawrimore testified that on January 6, 2001, she and her husband noticed a white Ford Explorer sitting in her husbands grandmothers driveway.  They pulled into the driveway and saw a lady standing on the porch of Stevens deceased uncles house.  They backed out of the grandmothers driveway and drove over to the uncles house.  As the woman approached the car, Gingers husband rolled down his window and asked her if there was a problem.  The woman stated that she and her boyfriend had run out of gas, but that he had caught a ride with someone.  Steven and Ginger then gave the woman a ride to his parents home.  Ginger described the woman as being very nervous, twiddling her hands and making no conversation.  Thereafter, while watching the news one day, Steven and Ginger learned that a dead body had been discovered in Stevens grandmothers house.  They also heard that the dead man owned a white Explorer, which was missing.  The couple then contacted the police.  On January 24, the day Mr. Coates body was found, a detective with the Horry County Police Department spoke with Steven and Ginger about the matter.  Ginger picked out Haithcocks picture as the individual she had seen near the abandoned house on January 6.  Ginger also made an in-court identification of Haithcock as the person she saw on Dongola Highway that day.  
Haithcocks sister, Cynthia Bowling also testified on behalf of the State.  In January 2001, Cynthia, who lived in Charleston, was contacted by Haithcock.  Haithcock was living in Myrtle Beach at the time, and she told Cynthia she was coming to Charleston at 10:00 a.m. on January 25 and she wanted Cynthia to meet her at a Burger King there.   When Cynthia met her as requested, Haithcock was driving a white Ford Explorer.  Haithcock told Cynthia she needed a place to park the car.  Cynthia told Haithcock it was not a problem, that she had a friend with a big yard, and she could park the car there as long as she needed.  After Haithcock followed Cynthia to her friends house, the Colaskos, she parked the Explorer and Cynthia gave Haithcock a ride to their mothers home.  Thereafter, Cynthia contacted the Horry County Sheriffs Department.  She told officers she did not know what was going on, but that her sister had brought her an Explorer and asked her to park it, and whatever was going on with the situation, she did not want anything to do with it.  Cynthia further testified that, prior to 1997 or 1998, Haithcock and Mr. Coates had a close relationship, having lived together and bought properties together, including land, a condo, and a boat.  After that time, they still engaged in sexual relations and would have dinner together, but they lived separately.  
After receiving information from Horry County authorities regarding an Explorer being located on Johns Island, officers from Charleston County went to the Colasko residence and found the automobile parked in a wooded area next to a house.  The tag on the vehicle was run through the system and it came back as being registered to the victim, Mr. Coates.  
At trial, the State presented gun and bullet evidence providing possible links between Haithcock and the weapon and ammunition used to kill Mr. Coates.  Records from a Myrtle Beach pawn shop showed Haithcock had purchased a Taurus PT-25 caliber handgun on August 8, 1997.  During their investigation, officers also discovered in a bag belonging to Haithcock a receipt for a magazine clip for a Taurus PT-25 caliber pistol which showed the clip was purchased by Wanda Haithcock on November 7, 2000.  A search of Haithcocks residence turned up a .25 caliber live round of ammunition found on a bookshelf in the living room area.  The State presented the testimony of SLED Agent Ira Parnell, who was qualified as an expert in firearm identification, including ammunition and ammunition component.  Agent Parnell examined the two .25 caliber cartridge cases found at the crime scene, the unfired cartridge found in Haithcocks home, and the two bullets retrieved from Coates body.  The agent testified they were looking at a semi automatic .25 auto caliber pistol that was used in this case.  In comparing the two fired bullets retrieved from Mr. Coates body, he determined they were fired from the same gun.  He also stated, while there were hundreds of different .25 caliber firearms, there were only seven brands of guns that could have fired those bullets, and one of those brands was a Taurus.  In comparing the two fired cartridge cases found at the scene, Agent Parnell was able to determine they had been fired from the same firearm.  Additionally, in comparing the two fired cartridge cases microscopically to the unfired cartridge found in Haithcocks home, he concluded from the extractor and ejector and other handling marks that the unfired cartridge had been loaded into and extracted from the same firearm that had fired the two shell casings found at the crime scene.  Thus, all three had been loaded into the same gun at some time.  Additionally, the two fired cartridge cases and the one unfired cartridge were all the same caliber, manufacturer and brand.  
Following the close of the States case, Haithcock moved for a directed verdict arguing the evidence was insufficient to support the charge against her.  The trial court denied the motion finding the evidence, albeit circumstantial, was sufficient to send the case to the jury when considered in the light most favorable to the State.  Thereafter, the jury convicted Haithcock of murder, and this appeal followed.
LAW/ANALYSIS
On appeal, Haithcock contends the trial court erred in denying her motion for directed verdict based on the evidence presented.  She argues there was no evidence of any animosity between her and the victim, the evidence as to the time of the victims death was weak and she was only placed at the abandoned house nineteen days before the victims body was discovered, there was no evidence placing her inside of the house where the body was found, and the evidence showed the house was a haven for unseemly activity.  Additionally, she argues the evidence of the chambered bullet could be explained by the fact that she and the victim had access to each others property, such that the victim could have had her gun at the time of his death, giving access to anyone who had access to him.  Accordingly, Haithcock contends the State failed to show substantial circumstantial evidence reasonably tending to prove her guilt, and the trial court therefore erred in failing to direct a verdict of not guilty.  We disagree.
In reviewing the denial of a motion for a directed verdict, the evidence must be viewed in the light most favorable to the State.  State v. Fennell, 340 S.C. 266, 270, 531 S.E.2d 512, 514 (2000).  If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury.  State v. McCombs, 368 S.C. 489, 493, 629 S.E.2d 361, 363 (2006).   When a motion for directed verdict is made where the state relies exclusively on circumstantial evidence, the trial court is concerned with the existence or nonexistence of evidence, not with its weight.  State v. Cherry, 361 S.C. 588, 594, 606 S.E.2d 475, 478 (2004).       
Where the evidence is circumstantial, the trial court has a duty to submit the case to the jury if there is substantial circumstantial evidence which reasonably tends to prove the guilt of the accused, or from which the accuseds guilt may be fairly and logically deduced.  State v. Arnold, 361 S.C. 386, 389, 605 S.E2d 529, 531 (2004).  Unless there is a total failure of competent evidence as to the charges alleged, refusal by the trial judge to direct a verdict of acquittal is not error.  Id.  On the other hand, the trial court should grant a directed verdict motion when the evidence merely raises a suspicion that the accused is guilty.  Id. at 390, 605 S.E.2d at 531.  Suspicion implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof.  Cherry, 361 S.C. at 594, 606 S.E.2d at 478.  However, the trial court is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis before denying a motion for directed verdict.  Id.  Rather, our supreme court has rejected the contention that in ruling on a directed verdict motion, the trial judge must grant a directed verdict unless the circumstantial evidence pointed conclusively to the defendants guilt, to the exclusion of every other reasonable hypothesis.  Id.   
In the instant case, considering the evidence in the light most favorable to the State, the record provides substantial circumstantial evidence reasonably tending to prove Haithcocks guilt.  Haithcock was identified by two people as the woman who was found outside the same abandoned home where Mr. Coates was found shot, on the exact same day as Mr. Coates disappearance.  Not only was she was identified as being present at the scene of the crime around mid-day, she was identified as being seen there some time after darkness on that date by another individual.  While she gave the story earlier in the day that she had run out of gas and that her boyfriend had had already caught a ride to go bring some back, she was again seen at the location after dark, giving the same story about having run out of gas and her boyfriend catching a ride to go retrieve some.  Additionally, she was seen earlier in the day sitting in the drivers seat of a white Ford Explorer at the abandoned house, the same color and make of car as owned by Mr. Coates.   She was later observed getting into the drivers side of the Explorer when she was returned to the car that night after making a phone call.  The case received media attention on January 24, 2001, and the very next day, Haithcock drove Mr. Coates white Ford Explorer to Charleston and asked her sister for help finding a place to park the car.  Finally, there was evidence presented that Haithcock owned a Taurus PT-25 caliber handgun, the same caliber as that used in the murder of Mr. Coates and one of only seven out of hundreds of .25 caliber guns that could have fired the bullets recovered from Mr. Coates body.   The evidence also showed Haithcock had purchased a magazine clip for a Taurus PT-25 caliber pistol approximately two months before the murder, and a .25 caliber live round of ammunition found in Haithcocks home was determined to have been chambered in the same firearm that had fired the two shell casings found at the crime scene.  As well, the two fired cartridge cases found at the scene and the one unfired cartridge found in Haithcocks home were all the same caliber, manufacturer and brand.
Given the evidence of (1) Haithcocks presence at the scene of the crime at two different times on the same day as Mr. Coates disappearance, (2) the fact that she was observed at the scene with the same color and make of car as owned by Mr. Coates, (3) the fact that she was inexplicably seen around mid-day and again after dark, both times claiming to have run out of gas and that her boyfriend had caught a ride to get some gasoline, (4) the fact that she drove Mr. Coates white Ford Explorer to Charleston the day after Mr. Coates body was discovered and the news was disseminated through the media, inferably attempting to hide the vehicle, (5) and the fact that there was gun and bullet evidence possibly linking Haithcock and the weapon and ammunition used to kill Mr. Coates, we find there was substantial circumstantial evidence reasonably tending to prove the guilt of Haithcock, and that the case was properly submitted to the jury.
For the foregoing reasons, appellants conviction is
AFFIRMED.
HUFF, BEATTY, and WILLIAMS, JJ., concur.

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.